In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-463 CR


____________________



ROBERT STALKNECHT, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the County Court at Law No. 4 


Montgomery County, Texas


Trial Cause No. 05-207042






MEMORANDUM OPINION


 A jury convicted Robert John Stalknecht of the misdemeanor offense of driving while
intoxicated and the trial court sentenced him to 180 days confinement in the county jail and
a $500 fine with both the fine and jail-time probated. Stalknecht appeals. 

 Stalknecht challenges the factual sufficiency of the evidence supporting the jury's
verdict. A factual sufficiency review requires us to ask "whether a neutral review of all the
evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously
weak as to undermine confidence in the jury's determination, or the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof." Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000); see also Watson v. State, 204 S.W.3d 404, 414-15, 417
(Tex. Crim. App. 2006). 

 Officer Jack Valenzuela with the Montgomery County Sheriff's Office testified that
while on duty on April 10, 2005, he observed a dark-colored Chevrolet Blazer "strike a curve
[sic]" in Montgomery County. He got behind the vehicle to observe the driver's actions. 
According to Officer Valenzuela, the driver took several wide turns, failed to use a blinker
on one turn, swerved into the oncoming lane of traffic, and several times almost went into
a ditch. Officer Valenzuela turned on the emergency lights and the Blazer pulled over. 
Stalknecht exited the Blazer, nearly stumbled, and caught himself with the door of his
vehicle. 

 When Officer Valenzuela approached Stalknecht, Officer Valenzuela smelled a strong
odor of alcohol on him. Stalknecht's speech was slurred. He told Officer Valenzuela that
he was "shit up," that he had been to TGI Fridays restaurant, and was going home. Prior to
administering the horizontal gaze nystagmus and vertical nystagmus tests, Officer Valenzuela 
asked Stalknecht to remove his glasses and then asked if he had any head injuries. Stalknecht
"pointed to something on his head" but did not indicate it was a head injury. Officer
Valenzuela noted six clues of intoxication for the HGN test, and also noted vertical
nystagmus which indicates a high level of intoxication. During the HGN test, Stalknecht
swayed back and forth and in a circular motion. Prior to taking the one-leg stand field
sobriety test, Stalknecht told Officer Valenzuela that he was missing part of a toe. Stalknecht
was unable to perform the one-leg stand test as well as the nine step walk-and-turn test. 
Other than stating he had part of a toe missing, Stalknecht did not indicate any other physical
reason he could not perform the nine step walk-and-turn test. 

 Officer Valenzuela admitted that he might not have given all the requisite instructions
to Stalknecht when he administered the one-leg stand test to Stalknecht. A back-up officer,
Deputy Paul Hahs, administered the walk-and-turn test due to a knee injury which prohibited
Officer Valenzuela from demonstrating the test. 

 Stalknecht told Officer Valenzuela that he had consumed five glasses of red wine that
were eight ounces each. When asked what kind of vehicle he was driving, Stalknecht
responded that he was driving a 1974 Blazer, but his vehicle was a 1994 Blazer. Stalknecht
consented to a breath test and Officer Valenzuela took him into custody and to the jail. 

 Trooper Travis Wroten with the Texas Highway Patrol testified that he administered
the intoxilyzer test to Stalknecht. He testified that while he had no independent recollection
of Stalknecht, he was sure he observed Stalknecht for fifteen minutes prior to asking him to
blow into the intoxilyzer because that was standard procedure. Trooper Wroten explained
that during that time, Stalknecht did not do anything that would have caused residual alcohol
to be left in his mouth. The results from the intoxilyzer test indicated Stalknecht's alcohol
concentration level was .173 at 3:24 a.m. and .170 at 3:27 a.m. 

 Glenn Merkord, technical supervisor for the Texas Department of Public Safety
Breath Alcohol Testing Program testified that on March 25, 2005 and April 28, 2005, the
same intoxilyzer used on Stalknecht was checked and it performed properly. He stated he
"would be fairly confident in saying with a reasonable degree of certainty" that Stalknecht's
alcohol concentration level at the time he was stopped was at least the same as it was when
he was tested. 

 Clay Woodgate testified that he met Stalknecht in the late 1970s or early 1980s when
they worked together in the maritime industry. They became friends and subsequently
Stalknecht became the godfather to Woodgate's daughter. Woodgate stated that earlier on
the same evening of Stalknecht's arrest, he met with Stalknecht to offer him a full-time job
as an operations manager with the company that employed Woodgate. At that time,
Stalknecht was working as a subcontractor for the company. 

 According to Woodgate, he and Stalknecht decided to eat at Macaroni Grill because
an adjacent restaurant, TGI Fridays, was too crowded. They arrived at Macaroni Grill around
11:00 p.m. Woodgate stated he was "completely sober" and "might have had a glass of wine
or a glass of beer." When asked how much Stalknecht had to drink that night, Woodgate
responded, "At the most, he would have probably had at the max two drinks[-]that would be
about normal for him." Later he testified Stalknecht had either one or two glasses of red
wine. Woodgate described Stalknecht as "not a heavy drinker" and he had never seen him
intoxicated before. Woodgate testified Stalknecht acted like himself that evening. They left
the restaurant around 1:00 or 1:15 a.m. They walked out together, and Woodgate observed
Stalknecht back his vehicle out and leave the parking lot. Woodgate stated there was nothing
abnormal about Stalknecht's driving as he left the parking lot. 

 Woodgate explained that he had seen Stalknecht limp badly at work due to a bad foot
and that Stalknecht sometimes suffered from dizziness while on the job. On one occasion,
Stalknecht was so exhausted and disoriented that he "could hardly walk the stairs to get up
to the captain's area." On another instance, Woodgate witnessed Stalknecht having difficulty
walking into the office and Stalknecht was "knocking into things." On that occasion,
Woodgate took Stalknecht to an emergency clinic and a doctor prescribed Stalknecht
medications, for which Woodgate paid $300. Woodgate said he was unable to provide the
receipts for the prescriptions or for dinner at Macaroni Grill because his company was
conducting their annual audit and the documents were at the company's CPA's office. 

 Stalknecht testified they arrived at Macaroni Grill around 10:30 or 11:00 p.m. He
stated he rarely drinks and that night, he consumed two and one-third glasses of wine. He
felt dizzy and nauseous when he left the restaurant. He was feeling "consistently worse"
before Officer Valenzuela pulled him over. He got out of the truck, was very dizzy, and
almost fell down because he "nearly passed out." He told Officer Valenzuela that he was
"messed up" but explained to the jury that what he meant by "messed up" was that he was
disoriented. He did not tell the officer at any time that he was nauseated, dizzy, or
disoriented. When asked why he told Officer Valenzuela he had five drinks when he only
had less than three, Stalknecht said he was just estimating. 

 Stalknecht explained that he had colon cancer and that in April 2005 he was still
healing from a secondary infection from stomach surgery that had been performed in
November. Months after the surgery, he still was taking large doses of antibiotics and still
experiencing dizzy spells. He testified he also has an amputated toe and a diabetic foot ulcer. 
He stated he suffers from frequent allergic reactions since his hospitalization for the stomach
surgery. At the time of trial, he was taking prescribed medication for diabetes and the foot
ulcer, as well as over-the-counter Zantac because he has problems digesting food. The trial
court admitted into evidence numerous medical records for Stalknecht. The records only
relate to treatment Stalknecht received in October and November of 2004. 

 The trial court admitted the videotape of the traffic stop into evidence and the jury
viewed the tape during the trial. The jury heard the witnesses' testimony as to whether
Stalknecht was intoxicated, and the jurors could determine the witnesses' credibility and the
weight to be given their testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon
1979). Viewed neutrally, the evidence establishing Stalknecht was intoxicated is neither so
weak nor is the evidence that he was not intoxicated so overwhelming as to undermine our
confidence that the jury rationally determined Stalknecht's guilt. We hold the evidence is
factually sufficient to sustain Stalknecht's conviction for driving while intoxicated. We
overrule Stalknecht's sole issue and affirm the judgment of the trial court.

 AFFIRMED.

 __________________________________

 CHARLES KREGER

 Justice


Submitted on September 19, 2007

Opinion Delivered March 12, 2008

Do not publish


Before McKeithen, C.J., Kreger and Horton, JJ.